UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____
MARLY KING and CEICILY WILLIAMS,

                    Plaintiffs,

        -against-

THE BLOCK INSTITUTE, INC.,

                  Defendant.
_____

**MEMORANDUM & ORDER**
**17-CV-7318 (NGG) (JO)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs Marly King and Ceicily Williams bring this action against their former employer, Defendant The Block Institute, Inc. ("Block"), alleging: (1) claims of retaliation under 42 U.S.C. § 1981 and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et. seq.* and (2) intentional infliction of emotional distress under New York state law. (*See* Compl. (Dkt. 1).) Before the court is Block's fully briefed motion for summary judgment. (*See* Def. Mot. for Summ. J. ("Mot.") (Dkt. 30); Def. Mem. in Support of Mot. ("Mem.") (Dkt. 30-1); Pls.' Mem. in Opp. of Mot. ("Opp.") (Dkt. 31); Reply in Support of Mot. ("Reply") (Dkt. 32).) For the following reasons, Block's motion is GRANTED.

## I.   STATEMENT OF FACTS

The court constructs the following statement of facts from the parties' Local Rule 56.1 statements of undisputed fact and the parties' submitted admissible evidence. (*See* Def. Local R. 56.1 Statement ("Def. 56.1") (Dkt. 30-2); Pls.' Local R. 56.1 Statement ("Pls. 56.1") (Dkt. 31-1).) Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that the court has deemed the underlying factual allegation undisputed. Any citation to a parties' 56.1 statement incorporates by reference the documents cited therein. The court has deemed facts averred in

a party's 56.1 statement to which the opposing party cites no admissible evidence in rebuttal as undisputed. Furthermore, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the court has disregarded the statement. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 87 n.2 (S.D.N.Y. 2012).[1] The court notes that Plaintiffs' 56.1 statement includes numerous such non-responsive denials; for example, Plaintiffs provide the identical paragraph-long denial (seemingly copy-and-pasted from their moving brief) for ten straight asserted facts. (*See* Pls. 56.1 at ¶¶ 25-35.) Such an approach "is in the best case, unproductive and contrary to the entire purpose of Local Rule 56.1 in that… [it does not] assis[t] the court by narrowing the scope of issues to be adjudicated." *Scholarchip, LLC v. Transworld Systems, Inc.*, No. 17-CV-6296 (NGG), slip op. at 2-3 (E.D.N.Y. Apr. 24, 2020).

## A. Block's Residential Services Program

Block is a not-for-profit social services organization dedicated to enhancing the lives of developmentally disabled New Yorkers. (Def. 56.1 ¶ 1.) Of relevance here, Block maintains a Residential Services Program, through which it operates 19 sites across Brooklyn to help developmentally disabled adults achieve the highest levels of independence and community integration possible. (*Id.* ¶ 2.) The Residential Services Program has various levels of staffing. Residences are primarily staffed by Direct Support Professionals, who assist residents with daily living routines, and, in some cases, Qualified Intellectual Disabilities Professionals ("QIDPs"), who assist in developing each resident's plan of services. (*Id.* ¶ 4.) In addition, nurses, therapists, and other clinicians also support residents. (*Id.* ¶ 5.) Each of the 19 residences

---

[1] When quoting cases, unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

is managed by a Residence Manager and, in most cases, an Assistant Manager. (*Id.* ¶ 6.) Each Residence Manager (or, as the case may be, Assistant Manager) reports to a Program Coordinator; Program Coordinators report to the Residential Director; the Residential Director reports to Block's CEO. (*Id.* ¶ 7.)

Plaintiffs, who are both African-American, were Program Coordinators in Block's Residential Services Program: Ms. Williams began as a Program Coordinator in 2002, and Ms. King began as Program Coordinator in 2013. (*Id.* ¶ 15.) Plaintiffs held these positions until their removal in October 2017. (*Id.*) Plaintiffs' key duties included ensuring that each residence was in compliance with regulatory requirements, supervising Residence Managers and Assistant Managers in all aspects of their performance, overseeing the residential monitoring systems in place to ensure high-quality care, and maintaining the residences in a clean and safe manner. (*Id.* ¶ 17.) In addition, Plaintiffs were responsible for periodically auditing various aspects of the residences under their supervision. (*Id.* ¶ 18.) For instance, Plaintiffs were required to review residents' personal allowance ledgers, fire drill records, incident reports, financial records, and community inclusion calendars on a monthly basis (as well as staff training records on a quarterly basis). (*Id.* ¶ 19.)

Block's Residential Services Program is funded through a Medicaid waiver and is regulated by the New York State Office for People With Developmental Disabilities ("OPWDD"). (*Id*. ¶ 3.) Each Block residence is therefore subject to various regulatory requirements and is periodically audited by OPWDD for compliance. (*Id*. ¶ 8.) If OPWDD identifies any violations during the course of an audit, it issues a Statement of Deficiencies ("SOD") which requires the regulated entity to submit a Plan of Corrective Action ("POCA") detailing how it will remedy the violations and ensure future compliance. (*Id*. ¶ 11.) More serious regulatory violations may result in OPWDD issuing a "45-day letter" or a "60-

day letter" advising the regulated entity that the operating agreement for the audited residence may be terminated if the regulated entity does not correct the violations and demonstrate compliance in either 45 or 60 days. (*Id.* ¶ 12.) Receiving multiple 45- or 60-day letters may subject a regulated entity to placement on Early Alert status, which may trigger fines, increased monitoring, public disclosure of the entity's poor performance, and, ultimately, loss of the entity's operating license. (*Id.* ¶ 13.) Finally, in addition to OPWDD's audits and reviews, Block's Compliance Department conducts internal audits of each of its residences. (*Id.* ¶ 14.)

### B.  Plaintiffs' Pre-Complaint Reviews and Placement on Performance Improvement Plans

Beginning in 2012, Block's CEO, Dr. Scott Barkin, began to take steps to remedy chronic shortcomings in quality of care and management accountability in Block's Residential Services Program. (*Id.* ¶ 20.) Dr. Barkin replaced longtime Residential Director, Carol Robinson, with a new hire, Paul Blaise, and undertook what he called a Leadership Practices Inventory in 2015 to assess the overall management across the agency. (*Id*. ¶ 21.) As Mr. Blaise wrote in Ms. Williams's 2016 performance review, Block had "made a commitment . . . to re-examine the effectiveness of our leadership practices . . . acknowledging that how we have led in the past is no longer acceptable and does not work." (Mar. 5, 2016 Williams Performance Evaluation (Dkt. 30-16).)

While Blaise circled "meet[s] Job Expectations" on Ms. Williams's 2016 performance review, the evaluation included many negative comments. For example, Mr. Blaise wrote that "[i]n spite of Ms. Williams' experience and knowledge of the agency policy and procedures, she has not demonstrated [the] ability [to] administer her cluster effectively," and that "[d]uring the period under review, Ms. Williams did not demonstrate [the] ability to supervise her programs effectively." (*Id*. at 5.) The evaluation

noted some particularly "outrageous deficiencies," at certain of Ms. Williams's programs, including "poor survey results, thefts of individuals funds, missing [] [f]ire drill records, lack of review of Personal Allowance ledgers and submissions of receipts to the Finance Department in a timely manner, unavailability of [individual residents'] personal allowance, [and individual residents'] funds not accounted for." (*Id.*) Four days after completing Ms. Williams's performance review, Mr. Blaise emailed Dr. Barkin and Block's Director of Human Resources, Mary Ellen O'Driscoll, explaining that "it will make my work-life easier as the Director of Residential Services not to have [Ms. Williams] in the Department. I . . . have [had] enough of her poor performances, unwillingness to receive coaching, and constructive criticism." (Mar. 8, 2016 Blaise Email (Dkt. 30-17).) Dr. Barkin responded that he agreed with Mr. Blaise's assessment. (*Id.*)

In April, Mr. Blaise conducted a performance evaluation of Ms. King. (Apr. 4, 2016 King Performance Evaluation) (Dkt. 30-18).) Ms. King's evaluation included more positive comments than did Ms. Williams's; for instance, Mr. Blaise wrote that Ms. King had "shown improvement during the course of the period under review," and that "she has embraced the new environment created for the leadership team." (*Id* at 5.) However, Mr. Blaise wrote that Ms. King needed "support to be more outspoken and to come [up] with creative ideas to solve problems," and that she needed to "familiarize herself with the agency's policy and procedures." (*Id.*)

Despite Mr. Blaise's email to Dr. Barkin suggesting he wanted to terminate Ms. Williams, Block instead placed both Ms. Williams and Ms. King on Performance Improvement Plans ("PIPs"). (*See* King PIP (Dkt. 30-19); Williams PIP (Dkt. 30-20).) For the next year, Mr. Blaise also required Ms. King and Ms. Williams to meet with him monthly and document the achievement of various goals, including "conduct[ing] and document[ing] monthly

coaching sessions for program management to ensure that they are provided with consistent feedback and adequately trained to perform their duties." (Def. 56.1 ¶ 35.)

Over the next several months, however, residences under Plaintiffs' supervision continued to perform poorly on internal and external audits.[2] For example, on June 21, 2016, OPWDD issued Block a SOD after auditing a residence under Ms. King's supervision. (*Id*. ¶ 38.) OPWDD found that Block failed to provide sufficient opportunities for community inclusion for four of the five residents whose records were audited, and, for some residents, that there was no evidence that they were being provided with any community inclusion opportunities at all. (*Id*. ¶ 41.) OPWDD also identified regulatory violations at residences under Ms. Williams's supervision, including a finding that Block had failed to obtain a resident's informed consent before administering medication, failed to ensure that adequate numbers of staff were on duty, and failed to properly train staff on the signs and symptoms of diabetes. (*Id*. ¶ 43.) Other OPWDD audits revealed that certain staff at residences under Ms. Williams's supervision were not following the residence's fire evacuation plan and were incorrectly documenting fire drills. (*Id.* ¶ 44.) Finally, during an April 2016 audit of a residence under Ms. Williams's supervision, OPWDD found that the residence was dirty, that Block's assessments of a resident's money management skills were inconsistent, and that

---

[2] The court notes that it is troubled with certain of OPWDD's findings at Block residences throughout the entire relevant period of this case. While there is no dispute that the residences that received negative audits were, at the relevant times, under the supervision of either Ms. Williams and Ms. King, it is ultimately the responsibility of Block management, and Block as an institution, to ensure that the vulnerable populations it serves are getting the care, support, and treatment they need—something that the audits and other record evidence cast into serious doubt.

the residence's management team had not ensured that individuals were receiving all necessary health services. (*Id.*   ¶ 46.) At deposition, Ms. Williams herself testified that she was aware in 2016 that Block's senior leadership was concerned with Block's audit results. (Tr. of Oct. 8, 2018 Dep. of Ceicily Williams ("Williams Dep.") (Dkt. 30-11) at 56:21-57:12.)[3]

### C.   June 27, 2016 Complaint to Dr. Barkin

At a June 27, 2016 staff meeting, Plaintiffs confronted Dr. Barkin about what they considered to be unfair treatment. (Def. 56.1 ¶ 48; Pls. 56.1 ¶ 48.) The parties dispute exactly what was said, but it is clear that Plaintiffs accused Dr. Barkin of treating them differently from—and subjecting them to more scrutiny than—Block's Director of Nursing, Lucille Golembiewski, who is white. (*Id.*). Ms. King initially testified that she did not mention Ms. Golembiewski's race when Plaintiffs confronted Dr. Barkin and Ms. Williams initially testified that she did not use the word "discrimination" in the confrontation. (Tr. of Sept. 6, 2018 Dep. of Marly King ("King Dep.") (Dkt. 30-10) at 316:10-316:19; Williams Dep. at 245:9-245:13.) However, Ms. King testified that it was "obvious" she and Ms. Williams were alleging that Block was treating

---

[3] Plaintiffs' 56.1 Statement denies certain of the facts in this paragraph with a repeated, identical denial. The crux of this denial is that "[w]hile [Plaintiffs'] written job description for the Program Coordinator position suggested that a Program Coordinator would also be responsible for the supervision of clinical team members, that had never been the case, as a matter of practice." (*E.g.*, Pls. 56.1 ¶ 43.) For one thing, this denial is irrelevant in certain cases in which Plaintiffs deny a documented finding in an OPWDD audit, such as OPWDD's finding that Block's assessments of resident's money management skills were inconsistent. (Def. 56.1 ¶ 46.) To the extent the denial is meant to suggest that findings such as "the residence's management team had not ensured that [residents] were receiving all necessary health services," *id.*, were not issues within Plaintiffs' job responsibilities, the denial is likewise inappropriate because the relevance of a particular fact in Plaintiffs' claim is distinct from whether or not an undisputed fact exists.

Plaintiffs differently than Ms. Golembiewski based on their race because: "I'm black, and she's white. And the treatment was totally different." (King Dep. at 316:14-316:16.) And, after further questioning from her attorney, Ms. Williams revised her testimony, saying that "both" she and Ms. King used the word discrimination in the meeting with Dr. Barkin. (Williams Dep. at 24:5-246:14.) Ms. King further testified that, in response to her and Ms. Williams's complaints, Dr. Barkin responded that Block could "scrutinize [its employees] as it likes, and that [Plaintiffs] would not have ground[s] for a class action suit against Block." (King Dep. at 306:18-306:24.) Ms. Williams, for her part, testified that Dr. Barkin responded to their complaint by saying that Plaintiffs would have "no civil case against me." (Williams Dep. at 183:11.)

Several months later, Mr. Blaise resigned as Director of Residential Services and was replaced by Angela Medina-Braddox. (Def. 56.1 ¶¶ 57-58.) Despite the change in leadership, residences under Plaintiffs' supervision continued to perform poorly on regulatory audits. For example, on December 1, 2016, OPWDD issued a SOD following an audit of a residence under Ms. King's supervision which found that, *inter alia*, Block had failed to ensure that the residence was "clean and well maintained" and failed to conduct required fire safety drills. (Dec. 1, 2016 OPWDD Audit) (Dkt. 30-25).) The following month, on January 9, 2017, Ms. Medina-Braddox met with Dr. Barkin and the head of Human Resources, Mary O'Driscoll, to discuss Plaintiffs' performance. (Def. 56.1 ¶¶ 63-64.) In a memo written by Ms. O'Driscoll to Dr. Barkin and Ms. Medina-Braddox on January 24, 2017, titled "Roadmap for Reorganization of the Residential Services Program," Ms. O'Driscoll wrote that the group had decided at the January 9 meeting that "[t]he remaining members of Paul Blaise's management team, Program Coordinators Ceicily Williams and Marly DeBrosses King, will be terminated. . . Both have been on PIPs and their poor performance continues to undermine

our ability to turn the program around." (Jan. 24, 2017 HR Memo (Dkt. 30-27).) However, Plaintiffs were not terminated at this time; instead, Block fired Ms. Medina-Braddox, whom Dr. Barkin had determined was unable to rehabilitate the Residential Services Program. (Def. 56.1 ¶¶ 69-71.) In light of Ms. Medina-Braddox's termination, Block decided to leave Plaintiffs in their Program Coordinator positions, at least in part because their departure would leave the Residential Services Program with no Director or Program Coordinators. (*Id.* ¶ 73.)

However, the residences under Plaintiffs' supervision continued to receive negative audits throughout the first half of 2017. For example, an OPWDD audit of a Block residence under Ms. King's supervision revealed that "the facility failed to provide individuals with a sufficient number of opportunities to participate in community inclusion activities." (May 11, 2017 OPWDD Audit (Dkt. 30-28).) A residence under Ms. Williams's supervision received a 45-day letter which found, *inter alia*, that the residence had not conducted the required fire safety drills. (May 24, 2017 OPWDD Audit (Dkt. 30-31).) Plaintiffs' annual performance reviews—completed by Dr. Barkin and delivered to Ms. Williams on June 27, 2017 and Ms. King on July 28, 2017—reflected poor audit outcomes at residences under Plaintiffs' supervision. (*See* June 27, 2017 Williams Evaluation (Dkt. 30-34); July 28, 2017 King Evaluation (Dkt. 30-33).) Dr. Barkin's evaluations of Plaintiffs indicated they were not meeting expectations. (*Id.*)

### D.   Further Complaints by Plaintiffs

Beginning in the summer of 2017 and continuing through the fall, Ms. King allegedly made various complaints to Block management about how she was being treated. According to the Defendant's 56.1 statement—the relevant paragraphs of which Plaintiffs have admitted as true—the various complaints by Ms. King were:

- June 14, 2017: Ms. King complained at a meeting that she did not trust Block's other directors to help run the Residential Services Program;
- July 28, 2017: Ms. King complained at her performance evaluation meeting that she felt she was being discriminated against because Block was not holding Ms. Golembiewski accountable in a similar manner as Ms. King;
- September 2017: Ms. King complained to the Residential Director about nursing, staffing, and financial issues;
- October 2017: Ms. King complained during an October 2017 meeting with the Residential Director that she was being subjected to greater scrutiny than Ms. Golembiewski.

(*See* Def. 56.1 ¶¶ 91-95.)[4] During this time period, audits of residences under Plaintiffs' supervision continued to turn up negative results. For example, an OPWDD audit of a Block residence supervised by Ms. Williams found that Block had failed to ensure that residents had opportunities for personal privacy, a sanitary environment to avoid sources and transmission of infections, and meals served consistent with their dietary need. (Aug. 31, 2017 OPWDD Audit (Dkt. 30-36).) OPWDD issued a 60-day letter to a

---

[4] There are certain discrepancies between the paragraphs of Defendant's 56.1 statement that Plaintiffs admitted as true, and certain of Plaintiffs' filings. For example, Plaintiff filed an affidavit (styled as a "Statement") of Ms. King in opposition to Defendant's motion. (*See* Statement of M. King in Opp. to Mot. (Dkt. 31-11).) In the statement, Ms. King avers that at the June 14, 2017 meeting she also complained that Ms. Golembiewski was not being held to the same level of scrutiny as was Ms. King, and that "this could be perceived as discrimination." (*Id*. ¶ 34.) However, this statement conflicts with Ms. King's deposition testimony that she did not raise anything at the June 14, 2017 besides her concerns about the ability of other directors to help run the Residential Services Program. (King Dep. at 311:10-311:17.)

residence under Ms. King's supervision and threatened to close the facility. (*See* July 25, 2017 60 Day Letter (Dkt. 30-38); Def. 56.1 ¶¶ 109-110).)

In October 2017, Block removed Ms. King and Ms. Williams from their positions as Program Coordinators. (King Dep. at 198; Williams Dep. at 125:4-125:7.) Block offered Plaintiffs the opportunity to take other positions in lieu of termination; however, Block only offered non-supervisory positions (including positions at which Plaintiffs had worked many years earlier in their careers, as well as housekeeping and maintenance positions). (Def. 56.1 ¶ 114; King Dep. at 199:1-199:12; Williams Dep. at 131:3-131:9.) Plaintiffs opted not to pursue a non-supervisory job and did not return to Block in any capacity.

## II.  LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986)).

"To determine whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory

answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" *Mikhaylov v. Y & B Trans. Co.*, No. 15-CV-7109 (DLI), 2019 WL 1492907, at *3 (E.D.N.Y. Mar. 31, 2019). While the court must draw all inferences in favor of the non-movant, the non-movant "may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Finally, in considering Defendant's motion, the court is mindful that the Second Circuit "has long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'" *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

## III. DISCUSSION

### A. Retaliation Under Section 1981

Claims of retaliation under Section 1981 "are analyzed pursuant to Title VII principles" outlined in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). Therefore, the court analyzes Plaintiffs' claim under the burden-shifting framework set forth in *McDonnell Douglas*. *See Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). "To make out a prima facie case of retaliation, a plaintiff must make four showings: that (1) she engaged in a protected activity; (2) her employer was aware of this activity (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id*. "Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 619, 625 (2d Cir. 2001). If the employer carries that burden, then the burden shifts

back to the plaintiff, who must establish "that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* A plaintiff alleging retaliation must show that retaliation was a "but-for" cause of the adverse action, not simply a "substantial" or "motivating" factor in the employer's decision. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013). "But-for" causation does not, however, require proof that retaliation was the only cause of the employer's action—it is enough that the adverse action would not have occurred in the absence of the retaliatory motive. *Id.* at 360.

Plaintiffs' theory is that they were retaliated against for complaining of racial discrimination, *i.e.* that Block was treating Plaintiffs, who are black, differently than Ms. Golembiewski, who is white. Plaintiffs contend that they voiced this complaint on two occasions: first in the June 2016 staff meeting and then again in the June 2017 staff meeting.[5] (Opp. at 19-20.) Plaintiffs allege that after the June 2017 complaint they received their "first ever thoroughly negative performance evaluation[s]," and that, as a result of their complaints, they were terminated from their positions as Program Coordinators in October 2017. (Opp. at 22-23.)

---

[5] As described *supra*, it appears from both Defendant's 56.1 statement and Plaintiffs' depositions that Ms. King complained at various points during the summer and fall of 2017. However, Plaintiffs' brief focuses on the June 14, 2017 meeting as the key complaint for the purposes of the opposition to Defendant's motion. (*See, e.g.*, Opp. at 24 ("[T]he record evidence shows that [Plaintiffs] were terminated only after they engaged in protected activities on June 27, 2016 and June 14, 2017."). Therefore, the court likewise focuses on those two alleged complaints in considering the instant motion.

Plaintiffs' claim fails because they have failed to adduce evidence of a causal connection between their complaints of discrimination[6] and their removal from their positions as Program Coordinators. "A causal connection in retaliation claims can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019).

First, Plaintiffs fail to show that the protected activity was followed closely by discriminatory treatment. Plaintiffs argue that "the temporal proximity between [Ms. King's] June 14, 2017 complaint and [Ms. King and Ms. Williams's] job terminations strongly suggests retaliation." (Opp. at 23.) Although the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009), district courts in this Circuit "have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases). Here, the gap is considerably longer: Block terminated Plaintiffs from their Program Coordinator positions in October 2017, almost five months after Ms. King's June 14, 2017 complaint and a full 16 months after Plaintiffs' June 27, 2016 complaint. Although such a gap does not preclude Plaintiffs from establishing a causal connection through other evidence, it is insufficient on its own to do so. *See, e.g.*, *Murray*, 528 F. Supp. 2d at 274. The

---

[6] The court assumes, without deciding, that these complaints constituted protected activities.

14

temporal proximity is even less compelling in a case like this because Plaintiffs were receiving negative performance evaluations and were placed on PIPs even before their first complaint. (*See* Mar. 5, 2016 Williams Performance Evaluation; Apr. 4, 2016 King Performance Evaluation.)

In addition, Plaintiffs have failed to adduce any further circumstantial evidence giving rise to the inference of retaliation beyond the temporal proximity of their 2016 and 2017 complaints and their termination in October 2017. For instance, Plaintiffs argue that the fact that Block considered terminating Plaintiffs *before* October 2017 (but declined to do so) suggests that Plaintiffs "were terminated only after they engaged in protected activities on June 27, 2016 and June 14, 2017." (Opp. at 24.) Yet, without more, that claim simply relies on the temporal proximity between the June 2017 complaint and Plaintiffs' termination, which is insufficient. Further, Plaintiffs devote a significant portion of their argument to the allegation that they were treated differently than their white colleague, Ms. Golembiewski. While any such differential treatment may be grounds for a race discrimination claim, Plaintiffs have only alleged a claim for retaliation. As such, Block's alleged disparate treatment of Plaintiffs—*i.e.* the merits of the underlying discrimination complaint that constitutes protected activity for the basis of Plaintiffs' claim—is not relevant to the question of whether Plaintiffs can establish a causal connection between the protected activity and the adverse employment action. *See Natofsky*, 921 F.3d at 353 (for the purposes of a retaliation claim, disparate treatment of other employees is relevant insofar as those employees also engaged in similar protected activity).[7]

---

[7] Plaintiffs also suggest that the fact that, at Block, there had never been "any prior instances of terminating other Program Coordinators due to deficiency notices," is further evidence of a retaliatory motive. (Opp. at 26.)

Finally, Plaintiffs fail to put forward direct evidence of retaliatory animus directed at Plaintiffs. Plaintiffs suggest that Block's "[retaliatory] animus manifested itself in [P]laintiff[s'] subsequent performance evaluations," which Plaintiffs contend were the "first ever thoroughly negative performance evaluation" either had received. (Opp. at 22.) That is inconsistent with the evidence, however, which shows that Plaintiffs received negative performance reviews well before both the June 2016 and June 2017 complaints.  For example, both Ms. Williams and Ms. King had been placed on PIPs in April 2016 as a result of problematic performance evaluations, which included "outrageous deficiencies." (Mar. 5, 2016 Williams Performance Evaluation). The evidence is likewise inconsistent with Plaintiffs' assertion that they were "meeting their job expectations, until they complained about racial discrimination on . . . June 14, 2017." (Opp. at 23.) To the contrary, in the months after Plaintiffs were first placed on PIPs in April 2016, Block residences under Plaintiffs' supervision received numerous SODs from OPWDD. For example, OPWDD issued a 45-day letter in connection with an audit of a Block residence under Ms. Williams's supervision, finding, *inter alia*, that follow-up doctor's visits had not been scheduled for one of the residents and that, during the prior year, the residence had not conducted a dead-of-night or blocked-access fire drill. (May 24, 2017 OPWDDD Audit). Plaintiffs' performance was so poor that the Human Resources Director documented that "[b]oth [Plaintiffs] have been on PIPS and their performance continues to undermine our ability to turn the program around." (Jan 24, 2017 HR Memo.) Finally, the evidence suggests that Plaintiffs'

---

The evidence, suggests, however, that Block has terminated numerous employees—including those at the Residential Director level—for performance reasons, none of whom complained of discrimination or otherwise engage in protected activity. (*See* Decl. of Mary Ellen O'Driscoll (Dkt. 32-2); Def. 56.1 ¶¶ 67-71.)

poor performance continued well after the June 14, 2017 meeting. (*See, e.g.*, July 25, 2017 OPWDD Audit.)

Because Plaintiffs fail to establish a causal connection between their protected activity and their termination, they fail to establish a prima facie case of retaliation. Accordingly, Plaintiffs' Section 1981 retaliation claim is dismissed.

## B.   Retaliation Under NYCHRL

The NYCHRL retaliation provision has important differences from Title VII when it comes to the causal link a plaintiff must demonstrate between her protected activity on the one hand and the defendant's retaliatory act on the other.[8] In particular, a plaintiff need only establish that her protected activity was a motivating factor behind the defendant's retaliatory act—not, as under Title VII, that it was a but-for cause. *See Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 456 (E.D.N.Y. 2013). Even under the NYCHRL's "broa[d] construction," however, for the reasons discussed above, Plaintiffs "cannot link [their termination] to a retaliatory motivation." *Williams*. 872 NY.S. 2d at 35. Accordingly, Plaintiffs' NYCHRL retaliation claim is likewise dismissed.

## C.   Intentional Infliction of Emotional Distress

Under New York law, a plaintiff claiming intentional infliction of emotional distress must show: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe

---

[8] There are other important differences. The NYCHRL's definition of protected activity has been broadly construed, *see Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011), and the NYCHRL prohibits an "even broader" range of retaliatory actions relative to federal and state law. *Gorman v. Covidien, LLC,* 146 F. Supp. 3d 509, 534 (S.D.N.Y. 2015); *see also Williams v. New York City Housing Authority*, 872 N.Y.S.2d 27, 34 n.12 (1st Dep't 2009) (NYCHRL "specifically rejects a materiality requirement").

emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). "[A] claim for intentional infliction of emotional distress must satisfy an exceedingly high legal standard." *DiRuzza v. Lanza*, 685 F. App'x 34, 36 (2d. Cir 2017) (summary order). Liability for intentional infliction of emotional distress arises "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko v. Am. Broad. Cos., Inc.*, 27 N.Y.3d 46, 57 (2016). Even "[a]ctions likely to be considered reprehensible by most people are not sufficient." *DiRuzza*, 685 F. App'x at 37.

Here, no reasonable jury could find that Defendant acted with the level of "outrageous[ness]" required to prove an intentional infliction of emotional distress claim. Plaintiffs argue that Block's offer to Plaintiffs that they could remain working for Block in non-supervisory positions—including in entry-level positions they had held years prior as well as maintenance and housekeeping positions—caused great emotional pain and humiliation for Plaintiffs, and that Block knew or reasonably should have known that such an offer would have that result. (Opp. at 27-30.) That Plaintiffs might have felt humiliated or insulted may well be true; however, these allegations, without more, are simply insufficient to create a triable issue of fact as to Plaintiffs' claim. Accordingly, Plaintiffs' intentional infliction of emotional distress claim is dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's (30) motion for summary judgment is GRANTED. The clerk of the court is respectfully DIRECTED to enter judgment in favor of Defendant and close the case.

SO ORDERED.


Dated:      Brooklyn, New York
            May 18, 2020


                                    /s/ Nicholas G. Garaufis
                                   NICHOLAS G. GARAUFIS
                                   United States District Judge